# INDEX OF GOVERNMENT EXHIBITS

| Exhibit No. | Description |
|:---:|:---|
| 1 | Summary of Investigation, EEO Case No. 10-02 (May 19, 2010) |
| 2 | Decl. of Lauren Long (Mar. 1, 2011) |
| 3 | Request to Begin Precomplaint Counseling (Dec. 7, 2007) |
| 4 | Interview Questionnaire, Joe Landino (Jan. 15, 2008) |
| 5 | Memorandum re: Hostile Work Environment Inquiry (Feb. 13, 2008) |
| 6 | Memorandum to Joe Landino from Kenneth L. DeWitt (Feb. 22, 2008) |
| 7 | Request to Begin Pre-Complaint Counseling (Jan. 16, 2008) |
| 8 | Decl. of Ralph Haller (Mar. 2, 2011) |
| 9 | Decl. of Jeanne Foster (Mar. 4, 2011) |
| 10 | Resolution Agreement and General Release (February 14, 2008) |
| 11 | Memorandum For the Record re: GEOINT Mission Manager, SIS, and ED032 |
| 12 | Decl. of Vernon Grapes (Mar. 15, 2011) |
| 13 | Sworn Statement of Joseph J. Landino, EEO Case No. 10-02 |
| 14 | Letter from Wendy E. Sheldon, CIA OEEO, to Subhasnini Bollini re: EEO Case No. 10-02 (Dec. 9, 2009) |
| 15 | Decl. of Darlene Minick (Mar. 23, 2011) |
| 16 | Jeanne C. Foster, Witness Affidavit, EEO Case No. 10-02 (May 17, 2010) |
| 17 | HK313, SIS, Director, Special Programs Group, COMM/SPG Interview Panel Summary and Recommendations |
| 18 | Counseling Report 10-30 (Aug. 13, 2010) |
| 19 | O-6/BCSS, Deputy Director, IMINT, Interview Panel Summary and Recommendations (Aug. 19, 2010) |
| 20 | Letter from Annette Wyeth, NRO OEEO&DM, to Joseph J. Landino re: EEO Complaint dated 29 November 2007 (July 30, 2009) |

| Exhibit No. | Description |
|:---:|:---|
| **21** | Landino v. Carlson, EEOC Case No.: 570-2010-00812X, Order (Oct. 20, 2010) |
| **22** | Landino v. Carlson, EEOC Case No.: 570-2010-00812X, Order (Oct. 20, 2010) |
| **23** | Landino v. Carlson, EEOC Case No.: 570-2010-00812X, Order (Nov. 5, 2010) |
| **24** | Letter from Wendy E. Sheldon, to Subhashini Bollini re: EEO Case No. 10-30 (Joseph J. Landino, Jr.) (Feb. 28, 2011) |
| **25** | Landino v. Carlson, EEOC Case No.: 570-2010-00812X, Order (Dec. 10, 2010) |
| **26** | Position Description for D/NSEM (Mar. 19, 2010) |

# GOVERNMENT EXHIBIT 1

~CU5543782~

**Secret**

## SUMMARY OF INVESTIGATION
## EEO Case No. 10-02

1.  **(U) Description of Complaint**

    a.  **(U//FOUO) Complainant Data**

    Name:  Joseph J. Landino, Jr.

    Position Grade/Title: SIS-3/ Director, National
    Space Environmental Monitoring Program

    Employer:  Central Intelligence Agency (CIA)

    Work Address:  Washington, D.C.

    Representative:  Subhasnini Bollini, Esq.
    R. Scott Oswald, Esq.
    The Employment Law Group, P.C.
    888 17th Street, NW, Suite 900
    Washington, DC  20006-3307
    Telephone:  202-331-2883
    FAX:  202-261-2835

    b.  **(U) Bases for Alleged Discrimination**
    Reprisal

    c.  **(U) Summary of Issue/Allegation**
    (U//FOUO)

    **Issue and Basis:**  Complainant alleges that, on June 8,
    2009, the National Reconnaissance Office (NRO) placed him
    in a position in the Advanced Systems and Technology
    Directorate (AS&T) that is outside his area of expertise
    and well below his rank in terms of authority and
    responsibility, based on reprisal for prior participation
    in EEO activity.

    d.  **(U) Desired Resolution**
    (U//FOUO)
    Complainant seeks the following as resolution to the
    issue he raised:
    "Vacate Mr. Landino's February 2008 Resolution Agreement
    and General Release.
    "Reassignment to the Deputy Director, Systems Engineering
    position or a position equivalent thereto;

    2
    **Secret**

Secret

"Mr. Landino's reasonable legal fees and costs;
"Front pay and back pay;
"Compensatory damages for emotional distress;
"Compensatory damages for harm to professional
reputation;
"Entry into a non-retaliation agreement; and
"Correction of Mr. Landino's employment record."

2.  (U) **Chronology of EEO Processing**
    (U//AIUO)
    Initial Contact with OEEO:  14 July 2009
    Date of Alleged Discriminatory Event:  8 June 2009
    45th Day after Alleged Discriminatory Event:  23 July 2009
    Counseling Started:  Transferred to CIA/OEEO 20 August 2009
    Agreement to Extend Counseling, signed 27 August 2009
    Complaint Filed:  22 October 2009
    Counseling Report Submitted:  26 October 2009
    Acceptance by CIA/OEEO of Complaint:  9 December 2009
    180th Day after Complaint Filed:  20 April 2010
    Investigative Period Extended to:  Thirty (30) day extension,
    20 May 2010
    Period of Investigation:  January 2010-May 2010
    Place of Investigation:  Headquarters Area
    Investigator:  Margaret Theriault

3.  (U) **Background Information**
    (U) Complainant holds a Masters in Public Administration
and in Systems Management.  He entered on duty with the Agency
in 1999 in the Community Management Staff at the GS-15 grade
level.  He was assigned in December 2003 to a Directorate of
Science & Technology/Office of Development and Engineering
(DS&T/OD&E) position located at the National Reconnaissance
Office, where, as a DS&T careerist, he served as Deputy
Director/Imagery Intelligence Systems Acquisition
Directorate/Systems Engineering Office (DD/IMINT/SEO).[1]  He
was promoted to the SIS rank in January 2003.  Complainant
subsequently served a tour at the National Geospatial-
Intelligence Agency (NGA) as Deputy Program Manager for the
National System for Geospatial Intelligence, commencing in
April 2008.  Complainant was granted a SIS personal rank of
SIS-3 in December 2008.  Complainant returned from NGA to NRO
in June 2009, where he began a job in the OD&E/Advanced
Systems & Technology Directorate.  An organizational
announcement of 29 May 2009 announced the selection of
Complainant to serve as the AS&T Directorate's National Space

---

[1]  (U) OD&E is an Office within the Central Intelligence Agency/Directorate of
Science and Technology (DS&T).

3

Secret

Secret

Environmental Monitoring Liaison (NSEML), assuming his duties effective 8 June 2009.

(U//AIUO) Although this Title VII complaint arose at NRO, the case was transferred to CIA for processing.

4. **(U)** __Investigative Origin__
   A. Disparate Treatment

   B. Questions to Complainant:
      See Complainant's sworn statement at Tab E-1.

5. **(U)** __Summary of Investigation__
   (U//AIUO)
   A. __Complainant's Allegations:__
   Complainant states that, on 8 June 2009, NRO placed him in a position as NSEML in OD&E/AS&T that is outside his area of expertise, which he identifies as systems engineering and program management, and well below his rank, SIS-3, in terms of authority and responsibility, based on reprisal for prior participation in EEO activity. With respect to the prior EEO activity for which he believes he was retaliated against, Complainant states that, when serving as DD/IMINT/SEO, he filed a complaint of gender-based harassment on 29 November 2007 against his then supervisor (Jan J., female), who at that time was Director/IMINT/SEO and that he further alleged in his complaint that then Director/IMINT (Ralph H., male) established and tolerated an environment in which Director/SEO was able to continue her abusive behavior with impunity. Complainant states that, after he filed his complaint of 29 November 2007 of gender-based harassment leading to a hostile work environment, then Director/SEO included an unfair, negative rating narrative in his performance assessment report (PAR) for the rating period of 3/1/2007 - 9/30/2007 and that, on 16 January 2008, he submitted a separate EEO complaint of reprisal for this negative rating. With respect to his current complaint, Complainant contends that his placement, on 8 June 2009, in a position in AS&T that is outside his area of expertise and below his rank in terms of authority and responsibility constitutes retaliatory action directed toward him by current Director/OD&E (D/OD&E), stemming from D/OD&E's position in the chain of command with respect to the subjects of his prior complaints of November 2007 and January 2008.[2] See Complainant's detailed account at Tab E-1.

---

[2] (C) Ralph H. and Jan J. are CIA/DS&T officers assigned to OD&E positions at NRO. Ralph H. became Principal Deputy Director/NRO in January 2008 and was Director/OD&E August 2008-March 2009. He took another assignment in March 2009. He retired in June 2009. In keeping with the responsibilities of the position of Deputy

4

C05543782

~~Secret~~

B.  **Management's[3] Response:**

(S) Management officials, Deputy Director/OD&E/AS&T
(DD/OD&E/AS&T), Director/OD&E/AS&T (D/OD&E/AS&T), and D/OD&E,
deny that their actions in this case were based on
Complainant's prior participation in the EEO process.  On the
contrary, they attribute their actions with respect to
offering Complainant the position he came to occupy in AS&T on
8 June 2009 to their determination that Complainant was the
most qualified potential candidate for the position in that
the position offered seemed to be a good match for his skills,
allowed for growth, visibility, and an opportunity to develop
a significant new program that had the attention and support
of the Director/CIA, and would be of benefit to AS&T, NRO, and
the nation.  Complainant's supervisor, Affiant 2, states that
he described the immediate need for a National Systems
Environmental Monitoring (NSEM) Program Director to
Complainant and informed him, both prior to his occupying the
position as well as in many subsequent discussions, that it is
a SIS position.[4]  He states that, although the position was
referred to as the AS&T National Space Environmental
Monitoring Liaison at the time of the release of a Director's
Note/Organization Announcement of 29 May 2009 naming
Complainant to this position, it was noted that the position
title did not properly represent the position or its
responsibilities and the position title was changed to
Director, National Space Environmental Monitoring Program.
Management is in agreement that the position Complainant
occupies in AS&T is a SIS Executive Manager Tier 1 position,
with significant and broad responsibilities.  Management is in
agreement that Complainant is responsible for performing the

---

Director/OD&E and the position of Director/OD&E for CIA/DS&T officers assigned to
an OD&E position at NRO, current Director/OD&E, Affiant 4, was the reviewing
official for Jan J's PARs for reporting periods October 2007-September 2008 and
October 2008-September 2009.  She will also be Jan J.'s reviewing official for the
current reporting period.
[3] (S) With respect to chain of command in regard to this EEO case, DD/OD&E/AS&T
[Affiant 2], with duty at NRO, is Complainant's direct supervisor and the rating
official for Complainant's performance appraisal report (PAR) for rating period
1 October 2009-30 September 2010.  DD/AS&T reports to D/OD&E/AS&T [Affiant 3], with
duty at NRO, who is the reviewing official for Complainant's PAR for the rating
period just mentioned.  D/AS&T reports to Deputy Director/OD&E and to D/OD&E
[Affiant 4], with duty at NRO.  Affiant 4 was named D/OD&E, effective 27 January
2009.  Affiant 4 served as DD/OD&E from May 2007 until becoming Director/OD&E in
January 2009; she also serves as Director/Special Communications Office/NRO and, as
such, is accountable to Principal Deputy Director/NRO.  D/OD&E reports to Deputy
Director/CIA/DS&T [David S.], her PAR rater, who prior to this appointment
effective 30 June 2008, was D/DS&T/OD&E, with duty at NRO, effective 8 May 2007,
and, additionally, was named Director of Systems Operations in November 2007.  He
served as DD/DS&T/OD&E, with duty at NRO, effective 1 March 2006; he served in this
role concurrently with the IMINT responsibilities assigned to him in 2005.  Affiant
4's PAR reviewing official is D/CIA/DS&T.
[4] (U//~~FOUO~~) In their testimonies in this regard, Complainant refers to the title of
the position he came to occupy in OD&E/AS&T as NSEML, whereas, Deputy Director/AS&T
refers to the position title as Director/NSEM Program.

5

~~Secret~~

CU5543782

Secret

responsibilities of his current assignment; that, if he is unhappy with his job and wants to move to another position, he has career service approval to apply for any vacancies he feels are appropriate; and that OD&E would fill the position with another SIS officer as soon as possible were Complainant to leave. (Tab E-2) .(Tab E-3), (Tab E-4)

**6.   (U) Evidence**

(U) With respect to Complainant's allegations in this complaint, Complainant's claims are in boldface italics and Agency responses are in regular italics:

(U//AIUO)

*Complainant contends that, with regard to his current complaint, retaliatory actions by D/OD&E, Affiant 4, toward him stem from D/OD&E's reporting relationship in the chain of command with respect to the subjects of his earlier EEO complaints of November 2007 and January 2008. Specifically, Complainant states that Affiant 4, in her then capacity as DD/OD&E, participated in the drafting and execution of a Resolution Agreement and General Release (Agreement) as part of a resolution to his gender harassment and reprisal complaints; that although he was given only ninety minutes to consider the Agreement and no opportunity to consult legal counsel, he signed the Agreement, on 14 February 2008, because he understood that the Agreement would offer protection against further retaliation by his then supervisor and believed that, because the Agreement contained a provision expunging the supervisor's retaliatory PAR comments, he could compete successfully for a position he wanted to apply for based on a fair assessment of his performance.[5] He states that, on the contrary, the subject of his earlier complaint, Director/IMINT Ralph H., made considerable efforts to ensure that he was not selected for the position. Complainant further states that, after the selection for this position was made, Affiant 4 asked a member of the selection panel whether he was going to file a complaint for not being selected. Complainant asserts that, as then DD/OD&E, Affiant 4 had an obligation to initiate an investigation if she suspected unlawful discrimination or retaliation in the selection process, however, despite having made an inquiry about his*

---

[5] (U//AIUO) Complainant states that, after filing his complaints of 29 November 2007 and 16 January 2008, he learned that then D/OD&E (now Deputy Director/DS&T) and DD/OD&E (now D/OD&E, Affiant 4) would be adjudicating his complaints. He states that Ralph H. had recently been promoted to NRO/Chief Operating Officer and Principal Deputy Director/NRO, thereby placing both then D/OD&E and then DD/OD&E under him as direct reports.

000006

Secret

intentions, she did not do so.  Complainant states that, to
escape continued reprisal he believed he would be subjected to
by the subjects of his complaints of November 2007 and January
2008, he opted in April 2008 to leave NRO to serve in a
rotational assignment at NGA.  (Tab E-1)

Complainant states that, in January 2009, he decided to
return to NRO after a year at NGA.  With respect to the
subjects of his earlier complaints, he states that, the
Agreement of 14 February 2008 provided that his former
supervisor Jan J. would no longer be a rating official with
respect to his job performance appraisal were he to return to
NRO.  He states that Ralph H., in addition to serving as Chief
Operating Officer/NRO and Principal Deputy Director/NRO from
September 2008 until he transferred to another NRO assignment
the end of March 2009, also served as D/OD&E, supervising
Affiant 4, DD/OD&E.  He states that Jan J. was Principal
Deputy Chief Operating Officer (PDCOO)/NRO in February 2009.
With respect to exploring job prospects, Complainant states
that he applied for several jobs at CIA and NRO, including the
position of Deputy Director/Systems Engineering Directorate
(DD/SED)/NRO.  He states that he was not selected for this
position and subsequently learned that misinterpretation of
the Agreement of 14 February 2008 by NRO limited his
opportunities for positions within NRO.  He states that the
Agreement, instead of facilitating his job prospects by
removing his former supervisor Jan J. from his supervisory
chain, restricted his job prospects in his field of expertise
because, upon Jan J.'s promotion to PDCOO, there were no
positions at his SIS level within NRO that were not in
Jan J.'s chain of command.[6]  Complainant states that he first
learned in a meeting in April 2009 with Affiant 4, who became
D/OD&E effective 27 January 2009, that she was interpreting
the Agreement he signed with OD&E in February 2008 in a way
that significantly limited his eligibility for positions
within NRO.  He states that D/OD&E explained that were NRO to
select him for a position such as the DD/SED position he had
applied for he would necessarily be placed in Jan J.'s rating
chain, which would not be permitted under the terms of the
Resolution Agreement.  He states that, although as part of his
Agreement an officer other than Jan J. was assigned as his
rating official by OD&E even though Jan J. was at the time
supervising him day to day, D/OD&E elected not to accept a

---

[6] (U//FISO) According to OD&E/HR, Jan J. served in a Chief Operating Officer
capacity at NRO from April 2008–August 2009.  She became Principal Deputy Director-
Chief Operating Officer in February 2009.

7

Secret

Secret

similar reasonable alternative that would allow him to serve in the DD/SED position. He states that, due to mischaracterization of terms of the Agreement by D/OD&E, D/OD&E is responsible, in part, for his non-selection for the DD/SED position he applied for in the March 2009 timeframe. Complainant contends that Affiant 4 directed retaliatory actions toward him at the behest of Ralph H. He contends that D/OD&E used the terms of the Agreement of February 2008 to limit his future placement within NRO. (Tab E-1)

With respect to the matter at issue in this current complaint, EEO Case No. 10-02, Complainant asserts that D/OD&E knowingly coerced him into accepting the position he came to occupy in AS&T on 8 June 2009, which he identifies as NSEML, and continuing retaliation in reprisal for his prior EEO activity. He contends that this position is a GS-15 position outside his area of expertise and below his rank in terms of authority and responsibility. He states that, on asking D/OD&E if he could actually decline the position, she said that he would have to know who he would be turning down--the Director/DS&T/CIA and the Principal Deputy Director/NRO--, which he understood as an ultimatum to either accept the job or the bosses would be displeased.[7] He states that D/OD&E also said that the job was at Director/CIA's level, which implied to him, at the time, that it was a high-level position with considerable management authority. He states that, because he felt he had no choice but to accept the position in AS&T or cause irreparable damage to his relationship with high-ranking agency officials, he accepted the position. Complainant contends that his position in AS&T offers no substantive work and is not a SIS-level position, but rather a demotion in title, responsibility, and prestige. (Tab E-1)

Further, Complainant states that this position was documented in a vacancy notice with the file name Vacancy_ 2009-05-21_NSEML_GS15_06_May09_New_Form(2).doc., sent to him by DD/AS&T, Affiant 2, in May 2009 and that it is the vacancy notice he discussed with D/OD&E by telephone in late May 2009. Complainant contends that the intention was to staff the position with someone at the GS-15 grade level. He further contends that, after arriving to this position, he was told this by DD/AS&T at meetings and that he [Complainant] noticed the file name of the vacancy notice several weeks subsequent

---

[7] The Director/DS&T/CIA Complainant refers to became Director/DS&T 11 December 2005 and became Associate Deputy Director/CIA 28 December 2009.

8

Secret

000008

C05543782

Secret

to being on the job. He states that the position was previously filled by a GS-15 officer and that it lacks SIS Executive Manager Tier 1 attributes. He states that, two weeks after his arrival on the job, he informed D/AS&T and DD/AS&T that most of the work he thought had to be done in the position was already completed. Moreover, he states that the vacancy announcement calls for a person with environmental science qualifications, whereas, his field of expertise is systems engineering and program management. Further, Complainant states that, because he has no prospective work as NSEML, he informed OD&E management that he was unable to craft PAR objectives for the rating period, 1 October 2009 – 30 September 2010 and requested assistance in doing so. See **Tab E-1** for a detailed account. See also **Tab F-9**.

(U//AIUO) DD/AS&T, Affiant 2, Complainant's supervisor, SIS-3, who began his position as DD/AS&T in July 2008, states that, although he encouraged Complainant to accept the position, Complainant, himself, accepted the NSEM Program Director position in NRO/AS&T and was neither direct assigned nor placed in the position. DD/AS&T states that, he identified the NSEM Program Director position as a priority job fill at an OD&E Career Service Board (CSB) meeting, probably the 12 May 2009 CSB, and, as Complainant was returning to NRO from a rotational assignment, Complainant's name was put forth for consideration as a potential candidate who might match the position needs. He states that the NSEM position is a SIS Executive Manager Tier 1 position and organizationally a direct report to D/AS&T. He states that both he and D/AS&T considered Complainant the most qualified potential candidate to fill the NSEM Program Director position and, with approval from OD&E and DS&T to fill the NSEM Program Director as an SIS-level executive manager position, he and D/AS&T met with Complainant on 28 May 2009 to discuss the position, their objectives, and the responsibilities of the job and offered Complainant the job. (Tab E-2)

(U) With respect to Complainant's statements that the position is outside his area of expertise and below his rank in terms of authority and responsibility, DD/AS&T states, on the contrary, that, in his judgment, based on the personnel records, as well as on the skills and abilities Complainant represented to him, Complainant's expertise in systems engineering and program management is consistent with the required NSEM Program skills and abilities. He states that, based on the needs and requirements of the position itself, neither does he consider the NSEM Program Director position to

9

Secret

Secret

be below Complainant's rank in terms of authority and responsibility. He states that this position is consistent with SIS-level responsibilities and that the position was assessed by AS&T, OD&E, and confirmed by DS&T to be a SIS-level position. Further, DD/AS&T states that he does not agree with Complainant's assessment of the NSEM Program Director position, inasmuch as the only item that does not directly apply to the position is "Manages a budget of expendable resources," and even this objective has relevance in that he would expect the NSEM Program Director to strongly influence funding and activities being accomplished throughout the community in creating and growing the NSEM Program. He states that the fact that this is a new position and a new program was discussed with Complainant prior to his acceptance of the position and that he has discussed with him numerous times since that the objectives and scope of this assignment are SIS-level in the establishment of a new program to support a defined national priority and its coordination and integration with other national efforts in environmental monitoring. DD/AS&T states that Complainant's assessment of the position outlines his definition of a SIS position as one with a defined program, assigned budget, and assigned personnel, completely missing the point of creating the NSEM Program Director position. He states that, in response to Complainant's claim that he has no job to do, with which he does not agree, he asked Complainant to assist AS&T specifically in the area of systems engineering, which is Complainant's stated area of expertise. *(Tab E-2)*

(U//AIUO) DD/AS&T states that he met with Complainant on 15 January 2010 to discuss Complainant's approach to developing a NSEM Program plan and again described his objectives for the NSEM Program Director, the importance of the position and the program, and the need to develop a plan for moving forward. He states that, also, at this meeting, he asked Complainant to draft a set of PAR objectives they could work on. He states that in view of Complainant's statements to him that he felt that he did not have a job in AS&T, that he had been "put out to pasture," and that there were other "real" jobs in NRO that he could contribute to and needed to be done, he agreed to speak with D/OD&E, Affiant 4, about the potential for other job opportunities for Complainant, but again outlined the importance of the NSEM Program. DD/AS&T states that Complainant had on 1 October 2009 the same responsibilities he accepted when he started the job in AS&T on 8 June 2009. *(Tab E-2)*

Secret

~~Secret~~

(U//~~AIUO~~) DD/AS&T states that he subsequently met with D/OD&E, who agreed that the position responsibilities constitute a SIS-level position and that, after he outlined his objectives for the NSEM Program Director position to her, she indicated that his request for PAR objectives from Complainant seemed reasonable as well. He states that with regard to the matter of other job opportunities for Complainant, D/OD&E indicated that Complainant is responsible for performing against the responsibilities of his current assignment, but is free to apply for any vacancies he feels are appropriate. (Tab E-2)

(U//~~AIUO~~) DD/AS&T states that he and D/AS&T met with Complainant on 17 February 2010 to discuss the responsibilities of the NSEM Program Director and that, also, at this meeting he provided a set of objectives that could be used in the NSEM Program Director's PAR outlining the responsibilities of the position, which were the same objectives, focus areas, and vision that he had been describing to Complainant since May 2009. He states that he requested that Complainant review the objectives, to update as he felt appropriate, and/or to reword as he deemed necessary to state the objectives in what he considered SIS-level ~~executive manager language. DD/AS&T states that instead of~~ providing any feedback, adjustments or comments regarding his request to update the draft PAR objectives, Complainant sent an e-mail of 19 February 2010 to D/OD&E reiterating his opinion that that the objectives "do not meet the SIS Executive Manager Tier 1 attributes." (Tab E-2)

(C) With respect to Complainant's statements that subsequent to being on the job, he noticed that the written description of the position in AS&T indicated that it is a GS-15 position and that he learned it was previously occupied by a GS-15 officer, DD/AS&T states that, prior to Complainant's arrival in June 2009, he had considered and assigned a GS-15 officer in early 2009 to address some technical questions and act as liaison to the reforming Environmental Task Force. He states that he had developed a GS-15 vacancy for the position to outline the job by a GS-15 in support of certain responsibilities. He states that the vacancy announcement did show that GS-14s were eligible to apply. He states that, as a result of the GS-15 officer interfacing with the Environmental Task Force, it became apparent that more senior NRO involvement was required and, thus, the formation of the NSEM Program Director position. He states that the GS-15 vacancy announcement was draft and was never released nor posted. He states that he provided a copy

11

~~Secret~~

Secret

of the GS-15 vacancy announcement to Complainant as background
information so that he would have an understanding of thoughts
regarding the position and intended for Complainant to use the
document to supplement his understanding of the scope of the
new NSEM Program Director's responsibilities, the role and
activities that the GS-15 officer had been performing, and to
assist Complainant in developing his program and his personal
performance objectives.  DD/AS&T states that the GS-15 vacancy
announcement was not a description of the SIS position
Complainant occupies as the NSEM Program Director.  He states
that the GS-15 officer who was assigned in early 2009 to
support technical studies being conducted in support of the
Environmental Task Force was made available to Complainant as
Director/NSEM Program to support technical studies as deemed
appropriate by Complainant.  He states that the actual
responsibilities of the NSEM Program Director position
occupied by Complainant exactly match the job description of
the NSEM Program Director.  (Tab E-2)

(U//AIUO) With respect to his knowledge of Complainant's
participation in prior EEO activity, DD/AS&T states that he
has no knowledge of Complainant's previous EEO activity.  He
further states that he was unaware of this current complaint
until he received a request from the OEEO investigator for his
affidavit.  (Tab E-2)

(U//AIUO) Testimony by Affiant 3, SIS-4, D/AS&T since May
2008 and prior to that DD/AS&T commencing 21 August 2006,
supports that of DD/AS&T.  D/AS&T states that he proposed the
creation of the position Complainant occupies in AS&T in
response to a compelling need for the NRO and AS&T and, based
on Complainant's asserted systems engineering and program
management expertise and knowledge of the NRO, suggested that
Complainant would be a good match for the need.  He states
that he made the request to D/OD&E, Affiant 4, for a slot and
to have the position offered to Complainant.  He states that
Director/NSEM position [____]was allocated, which is the slot
Complainant had occupied previously while on rotation and
which continued to be a SIS Tier 1 slot.  D/AS&T states that
D/OD&E made the job offer to Complainant and Complainant
accepted it, effective 8 June 2009, reporting to him via
DD/AS&T as a direct report.  D/AS&T states that, in addition
to his judgment on the scope and level of the assignment and
the fact that he, grade level SIS-04, had been executing the
job duties, both HR and OD&E management had reviewed the scope
and there has been a subsequent review by CIA/HR, which
confirmed that this is a SIS assignment.  With respect to
performance evaluation of Complainant with regard to the SIS-

12

Secret

000012

C05543782

Secret

level bonus exercise, D/AS&T states that, based on the feedback he received on the progress and contributions made, he recommended that Complainant's contributions since June 2009 be valued as "Advancing Mission" and that, were the position Complainant occupies not a SIS position, Complainant would not have been eligible for any bonus.[8]  (Tab E-3)

(U//AIUO) With respect to concerns Complainant came to raise with him and DD/AS&T that the position he occupies is not SIS level, D/AS&T states that, upon Complainant's raising such concerns, both he and DD/AS&T explained to Complainant where they disagreed with his interpretation of the level of the assignment and asked Complainant to put together objectives that he believes are SIS-level.  He states that, in response, he and DD/AS&T received only repeated statements from Complainant that he was not doing SIS work and, therefore, he and DD/AS&T provided Complainant a set of written objectives and discussed them in detail with him; that Complainant rebutted the objectives, claiming they were either not his responsibility or were too low a level for his grade; that they again offered that they could "upgrade" the scope or modify the wording in any way that would meet the intent of the objectives they presented; and that, despite multiple informed opinions to the contrary, Complainant continues to disagree that the objectives he has been given are SIS level. With respect to Complainant's assertion that after he began working in the position, he learned that it is a liaison job with no supervisory authority, budgetary oversight, contract management responsibilities, or substantive work in his field of expertise, D/AS&T states that no supervisory authorities, budget oversight, or contract management responsibilities were promised as a part of the position; that there continues to be substantial system engineering and program management responsibilities that Complainant should be executing and for which Complainant claims to be qualified; and that the role of the position is to identify the program necessary to meet a compelling IC need, which goes unmet.  D/AS&T states that an experienced program manager should understand the life cycle of a program, starting with the development of advocacy for gaining resources and putting together a program plan, and that an experienced systems engineer, particularly one with extensive NRO and NGA experience, should understand how to connect requirements with solutions and alternatives and then launch the appropriate analysis to determine the efficacy of such solutions.  D/AS&T further states that, on Complainant's

---

[8] Information appearing in a HR database shows that Complainant received a SIS bonus in late February 2010.

13

Secret

000013

Secret

indicating that he did not like the job in AS&T and wanted to apply for other positions, he endorsed Complainant's wish, with the understanding that he would continue to deliver in the current assignment until he was accepted for a job he liked better.  With respect to Complainant's statements that the position he occupies was documented as a GS-15 position in a vacancy notice DD/AS&T sent him, D/AS&T reiterates that he and DD/AS&T explained to Complainant that he is analyzing a document that is not applicable to his position or assignment. He states that Complainant is the first individual to hold the assignment he occupies and the first to assume the incumbent responsibilities of this position.  (Tab E-3)

(U//AIUO) With respect to knowledge of Complainant's participation in prior EEO activity, D/AS&T states that he is aware of the EEO activity only through the filing of this complaint, EEO Case No. 10-02, and that there is no possibility that actions taken in AS&T were based on reprisal. (Tab E-3)

(U//AIUO) Affiant 4, SIS-4, has been D/DS&T/OD&E since 27 January 2009 and was prior to that DD/OD&E, commencing May 2007, is Complainant's career service manager and senior CIA/DS&T manager at NRO.  She states that, in keeping with standard procedure for a SIS officer to remind the career service that he/she is returning from a rotational assignment, Complainant informed her in February 2009 that he was looking for an onward assignment, after serving a rotational assignment at NGA.  D/OD&E states that since Complainant was actively applying for vacancies, upon learning, in May 2009, of a requirement for NRO to provide a SIS officer for a critical position supporting CIA and the Intelligence Community (IC), she offered this position to Complainant to support his integration back to OD&E and as an opportunity for him to contribute at a senior Agency level.  She states that she told Complainant she had proposed his name for this NSEML position and had discussed this with DD/DS&T, PDD/NRO, and DD/AS&T.  She states that, in response to Complainant's query as to whether she was management directing him into this assignment, she told him that management felt this was a great opportunity, but it was not a directed assignment.  She states that she explained to Complainant that when you are called on for an assignment, it is because there is a critical need and management believes you are the right person.  She states that she did not believe this SIS Tier 1 position was outside Complainant's area of expertise, but, on the contrary, believed that his prior experience in working at NRO and in other offices within the IC would be the right combination of

14

Secret

CU5543782

policy, technical insight, and representational skill for the program. She states that Complainant accepted the position and that his positive feedback that he had made a decision he was happy with reinforced that a good decision was made for Complainant, CIA, and NRO. (Tab E-4)

(U//AIUO) D/OD&E states that Complainant told her in a meeting on 28 September 2009 for a Succession Planning Feedback session that he was not happy in his assignment in AS&T and that he had done a comparison of his position against the SIS Executive Manager Tier 1 attributes, as he did not believe they aligned with his experience and credentials. She states that she told Complainant that his position was at the SIS level and encouraged him to work with his management and that DD/AS&T reiterated this to Complainant. She states that, contrary to Complainant's assertion, she never requested a copy of the position analysis Complainant did nor did she request a "write-up" from Complainant to show DS&T. She further states that, on 12 November 2009, Complainant requested permission to apply for a rotational assignment; that she provided approval, on 16 November 2009, for Complainant to apply for the rotational assignment he requested; that she reiterated that he was not management directed into his current position; that she told him that, if he was not happy in his assignment, he had her full support within established processes to look for an onward assignment; and that she offered assistance if he had any further questions. D/OD&E further states that she never told Complainant that she would put him back on the DS&T SIS list for placement if he was unhappy in the position he came to occupy in AS&T. She states that she did explain to Complainant his responsibility to perform in his current position as long as he occupies this position. (Tab E-4)

(U//AIUO) With respect to the SIS Pay Pool Exercise, D/OD&E states that as the DS&T/OD&E Pay Pool Manager, she met with D/AS&T to receive input with respect to Complainant's performance; that D/AS&T provided a positive report and recommended a rating of "Advancing Mission," which resulted in Complainant receiving an annual salary increase and performance bonus. D/OD&E states that, on 3 February 2010, she provided feedback from the SIS Pay Pool Exercise to Complainant, including that the memorandum for the record documenting his performance for the rating period 06/09/2009 – 09/30/2009, along with the comments provided by D/AS&T, was used as input for his receipt of a SIS bonus for 2009; that Complainant contended his position was not a SIS-level position; and that she reiterated that a rating of "Advancing

Mission" was directly a result of performance at the SIS level in a SIS position.  D/OD&E further states that Complainant's statement that the position he occupies is three levels below his grade level is inaccurate, as a SIS officer with a personal rank of SIS 1-3 can fill any SIS Tier 1 position. (Tab E-4)


(U//AIUO) With respect to her knowledge of Complainant's participation in prior EEO activity, D/OD&E states that, as the DD/OD&E, she was aware that Complainant had participated in prior EEO activity in the 2007-2008 timeframe.  She attests that she has no knowledge of any connection between Complainant's being assigned to the position he occupies in AS&T and reprisal for his prior participation in EEO activity. Moreover, D/OD&E states that there is no connection between any action or decision she made with respect to Complainant in the position he occupies in AS&T and his participation in prior EEO activity.  (Tab E-4)

(U//AIUO) With respect to the Agreement of February 2008 that Complainant makes reference to in his complaint, D/OD&E states that she was provided a copy of a resolution agreement signed by D/OD&E, David S., and NRO/Office of Equal Employment Opportunity and Diversity Management (OEEO&DM).  She states that, as D/OD&E and head of the career service, D/OD&E, David S., was the decision authority and, as his deputy, she was responsible to work with HR to ensure implementation of the settlement terms.  She states that she has no knowledge of the internal process of NRO/OEEO&DM regarding the time Complainant was given to sign an agreement or any discussions between Complainant and OEEO&DM.  With respect to Complainant's statements that after he signed the Agreement, Ralph H., the subject of his earlier complaint, made considerable efforts to ensure that he was not selected for the position of D/GMMO for which he had applied in March 2008 and that she, [D/OD&E, Affiant 4], had inquired whether he was going to file a complaint for non-selection for this position, D/OD&E states that she has no knowledge that Ralph H. made considerable efforts to ensure that Complainant was not selected for the position of D/GMMO and that she made no inquiry to any panel member with regard to whether Complainant was going to file a complaint for non-selection nor did she ever suspect discrimination or retaliation in any selection process.  With respect to Complainant's statements with regard to her approval of his rotational assignment to NGA the same day he submitted his application, D/OD&E states that she approved Complainant's request for the Deputy Program Management assignment at NGA because NRO had been asked to

16

Secret

provide senior officers to NGA; CIA/DS&T and NRO had agreed with NGA's request because it benefited both organizations' missions and broadened their officers; and that approval would have been immediate because CIA, NRO, and NGA had already agreed to implementation. With respect to Complainant's statements that D/OD&E was using the Agreement of February 2008 as an instrument of retaliation to limit his placement and restrict his employment prospects within his area of expertise and that D/OD&E coerced him into accepting the NSEML position in AS&T, D/OD&E states that she did not try to interpret the terms of the Agreement signed by Complainant; that she never stated that she believed the Agreement significantly limited Complainant's eligibility for positions within NRO or that the terms of the Agreement limited his placement within the organization; that she did refer Complainant to NRO/OEEO&DM for advice; and that she did not coerce Complainant into accepting the NSEML position in AS&T. She states that she never told Complainant that he would be turning down Principal Deputy Director/NRO and Director/DS&T/CIA if he did not take the position he came to occupy in AS&T. D/OD&E states that Complainant was afforded the opportunity to compete for multiple positions in NRO and CIA, but he was not selected. (Tab E-4)

(U) Investigator's Note:
    (U//AIUO) The record shows that Complainant occupies SIS position number _____ in AS&T. With respect to execution of a personnel action reflecting a title change from NSEML to Director/NSEM Program for the SIS position number _____ Complainant occupies in AS&T, it appears that full understanding of what the administrative standard operating procedure entails resulted in delay in concluding a personnel action reflecting the title change. According to information provided by Chief, DS&T/Business Strategies and Resources Center/Human Resources Group (BSRC/HRG), standard operating procedure to officially effect a position title change for SIS positions encompasses a written request to DS&T/Human Resources from the component pursuing the change, approval by DS&T, and endorsement by Corporate Human Resources Programs (CHRP).[9] An informal verbal agreement is not sufficient to accomplish a personnel action for a position title change. Chief/DS&T/BSRC/HRG relates that, in Complainant's case, there

---

[9] (U//AIUO) Information appearing on the HR website shows that DS&T/BSRC is the Directorate's administrative hub, providing services for both the ODS&T and the Directorate as a whole. CHRP provides expert consultation in the areas of talent management, HR policy, strategic compensation, performance management, and workforce analytics. Performance management includes job analysis, position management, position reviews, and all requests to change, add, or delete job titles and codes.

000017

Secret

are no substantive changes as neither the duties nor the scope of the job is changing, therefore, it is fairly simple for Corporate HR to go into the HR system and update the new title in the various databases.  Documentation appearing at Tabs F-1 and F-2 shows that the position number Complainant came to occupy in AS&T, [        ] is a SIS position and was so when occupied by the previous incumbent.  Documentation appearing at Tab 5 shows a request of 13 April 2010 by OD&E/HR to DS&T/HR for a title change for position [        ] to Director/NSEM Program.  Documentation of 27 April 2010 appearing at Tab F-6 shows that a title change for SIS position number [        ] from NSEML to Director/NSEM Program has been completed by HR/CHRP.

7.  **(U)  Documentation**

(U//AIUO)  Extract of HR database printout showing HR/CHRP review of 3 June 2008 of SIS positions
(This shows Complainant's position number [        ] and Tier Executive Level 1 – Manager)  (Tab F-1)

(U//AIUO) Documentation entitled Personal Rank for Senior Intelligence Service (SIS) Officers—Initial Assignment and Advancement in Personal Rank;
Extract of HR database printout of 8 September 2008 of SIS personal rank
(Per DS&T/HR, this shows Complainant was recommended for and received the personal rank of SIS-3.  At that time Complainant was in his previous position, which was a Tier 1 ranking.  This documentation also shows the personal rank of the officer who was in the position Complainant occupies now.  This officer was also moved to a personal rank of SIS-3.  Per DS&T/HR, an officer who has a personal ranking of 3 is legitimately and normally assigned to a Tier 1 position.)  (Tab F-2)

(U//AIUO) Extract of DS&T manning table, which indicates both the reporting chain for Complainant and the classification of his position
(The schedule BCSS equates to SIS level.)  (Tab F-3)

(U//AIUO) SIS Position Description for position number FT040
(Per DS&T/HR, this was reviewed on 19 July 2009 and 1 October 2009.)  (Tab F-4)

(U//AIUO) Request from OD&E/HR to DS&T/HR for title change of position [        ] to Director/National Space Environmental Monitoring Program  (Tab F-5)

Secret

(U//AIUO)  Notification by HR/CHRP to DS&T/HR that the title change of position [    ] from NSEML to Director/NSEM Program has been completed  (Tab F-6)

(U//AIUO) Complainant's PARs for:
Rating Period 05/01/2006 - 02/28/2007,
Rating Period 03/01/2007 - 09/30/2007,
Rating Period 10/01/2007 - 05/04/2008,
Rating Period 05/05/2008 - 09/30/2008,
Rating Period 10/01/2008 - 06/08/2009,
MFR for Rating Period 06/09/2009 - 09/30/2009
(Tab F-7)

(U//AIUO) Documentation provided by Complainant in connection with his earlier complaints, which complaints he alleges resulted in reprisal action toward him with respect to his claim in EEO Case No. 10-02: Declaration of Karyn [  ] R., dated 13 August 2009; Declaration of Randall B., dated 5 November 2009 (with respect to Item 3 appearing in this declaration, Complainant's attorney notes that this item should read "[Complainant] was my direct report from December 2003 through January 2007" v. "from in or about Spring 2005 through January 2007.")  (Tab F-8)

~~Secret~~

**EEO Case No. 10-02**

Margaret Theriault, OEEO Investigator
19 May 2010

# GOVERNMENT EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOSEPH J. LANDINO, JR.,               )
                                      )
        Plaintiff,                    )
                                      )
                                      )
            v.                        )        Civil Action No.: 1:10-cv-1385
                                      )        (LO/JFA)
                                      )
BRUCE CARLSON, Director               )
National Reconnaissance Office, *et al.*, )
                                      )
        Defendants.                   )
_____ )

## DECLARATION OF LAUREN M. LONG

I, Lauren M. Long, declare the following to be a true and correct statement of facts:

1. I am a United States Air Force ("USAF") government civilian, grade GG-14,
   employed as an Equal Employment Opportunity ("EEO") counselor and investigator
   assigned to the National Reconnaissance Office, Office of Equal Employment
   Opportunity and Diversity Management ("NRO/OEEO&DM") in Chantilly, Virginia.
   I also serve in the capacity of the NRO/OEEO&DM Chief of Military Equal
   Opportunity ("MEO"). Prior to serving in my current positions, I served in the
   capacity of an MEO technician in the NRO/OEEO&DM as a USAF enlisted senior
   non-commissioned officer from June 2004 until approximately May 2006. Shortly
   after my retirement from active duty in the USAF in 2006, I obtained my employ as
   an EEO counselor / investigator and Chief of MEO in the NRO/OEEO&DM and I
   have consistently served in this capacity to the present time. I have not testified
   previously in this or any other EEO complaint.

1

2.  Based upon reasonable inquiry and my knowledge, information, and belief, I state the following:

a.  On or around November 29, 2007, Joseph Landino filed a complaint with the Central Intelligence Agency ("CIA") Office of Equal Employment Opportunity ("OEEO") alleging that his superior, Jan Janssen, had generally harassed him and other male and female colleagues at the NRO.

b.  Mr. Landino filed a pre-complaint form describing his allegations on December 7, 2007.  Shortly thereafter, Kenneth DeWitt, then Acting Director of the NRO/OEEO&DM, assigned the complaint to me to conduct a non-EEO based harassment inquiry

c.  CIA Regulation 9-2 provides for the investigation of general harassment complaints—*i.e.*, complaints not based on discrimination ("non-EEO complaints").  Upon receiving the pre-complaint form, it was immediately apparent to me that Mr. Landino had raised a non-EEO complaint—the complaint made no allegations of discrimination based on a protected class (*e.g.*, race, gender, national origin).  Accordingly, I conducted a non-EEO based harassment inquiry between December 2007 and February 2008.

d.  As part of my inquiry, I interviewed Mr. Landino.  I explained to Mr. Landino in detail the nature of the EEO complaint process, as well as the difference between EEO and non-EEO complaints.  Put simply, I made Mr. Landino aware of all of his options for pursuing his claims, including his options for pursuing a claim of discrimination.

e.  Mr. Landino alleged generally that Ms. Janssen was rude and disrespectful to

all resident employees whom she had not brought with her when she transferred to the NRO. He further alleged that the person who should have filed a complaint was Anne Ketner, a female, because she had received the worst treatment from Ms. Janssen. Mr. Landino reiterated his point regarding Ms. Ketner consistently throughout his interactions and conversations with me. He stated and re-stated to me that he impressed upon Ms. Ketner to file an individual complaint against Ms. Janssen based on her alleged direct mistreatment and hostility toward Ms. Ketner.

f.  At no time during this interview and conversations with me did Mr. Landino ever allege that Ms. Janssen had discriminated against him on the basis of gender. At one point, Mr. Landino alleged that Ms. Janssen had told him to remind Robert Brodowski that if he did not like being supervised by a woman, he should get used to it because the "women are in charge." Upon hearing this allegation, I immediately put down my pen, looked Mr. Landino in the eye, and asked him whether he thought he had been discriminated on the basis of gender. He responded with an unequivocal "no." He further reiterated that Ms. Ketner received the brunt of Ms. Janssen's hostilities. When he repeated that same story later in the interview, I again asked him whether he believed he was being discriminated against on the basis of gender, and he again said "no." Mr. Landino explained that Ms. Janssen treated poorly everyone that had not come with her when she transferred into the NRO. This assertion was evident in the inquiry participant's statements – polarization between men and women for Ms. Janssen and those against Ms. Janssen.

3

g. On January 16, 2008, Mr. Landino also filed a retaliation complaint based on a negative rating he received from Ms. Janssen in his Performance Assessment Review ("PAR"). The complaint alleged that Ms. Janssen had retaliated against Mr. Landino because of his participation in the non-EEO based / general harassment inquiry, but it made no allegations of discrimination based on sex, or any other EEO basis.

h. Between December 2007 and the date that Mr. Landino ultimately executed a settlement agreement (February, 14, 2008), Mr. Landino called me almost daily to discuss the inquiry, and more specifically, to discuss the terms of the settlement.

i. During those conversations, Mr. Landino would outline his demands, and I would pass them along to Mr. Dewitt, who would then pass them along to the two individuals with the ultimate authority to enter into a settlement agreement, Jeanne Foster and David Shields.

j. On 17 January 2008 and then again on 13 February 2008, Mr. Landino came to my office to discuss the settlement agreement. During one visit, while I was revising the agreement on my computer based on the language he specifically dictated, Mr. Landino stood behind me reviewing the document on the screen and offering suggestions for how to phrase certain points. On both visits, Mr. Landino reviewed what would become the final version of the agreement, though it had not yet been authorized by Foster and Shields.

k. On February 14, 2008, I contacted Mr. Landino to inform him that the agreement had been approved and that it was ready for his signature. I did not

give Mr. Landino a deadline to sign the agreement or otherwise threaten to withdraw it. Mr. Landino never indicated to me that he was signing the agreement under duress. In fact, Mr. Landino thanked me for my assistance and expressed his satisfaction with the agreement because he was able to have the negative PAR expunged.

l.  During all of my conversations with Mr. Landino about the settlement, he never once mentioned that he had been discriminated against on the basis of sex. Nor did Mr. Landino challenge the statement in the agreement that NRO/OEEO&DM had conducted a "non-EEO based" inquiry.

m.  In late February 2008, Mr. Landino called me because his PAR had not been revised as contemplated in the settlement agreement. I explained that it often takes some time for the changes to be implemented, but I offered to contact human resources to try to expedite the process. In fact, I sent a memo to the human resources officer that addressed the need for expediting the PAR actions. I did this in an effort to support Mr. Landino's direct request to be able to use a "clean" PAR for his employment pursuits. Moreover, Mr. Landino thanked me for my assistance. Shortly thereafter, I was made aware that Mr. Landino had emailed Mr. DeWitt to compliment my performance during the resolution of his complaints.

n.  In or around April of 2009, Mr. Landino contacted me to ask whether he could vacate the settlement agreement. He explained that the agreement was undermining his eligibility for several positions at NRO because they necessarily included Ms. Janssen in his direct chain of command. I explained

5

that I could not help him with this problem, and that he should contact Annette Wyeth. Mr. Landino made no allegation that the agreement was being used to discriminate against him on the basis of sex.

o. Not once in any of my encounters with Mr. Landino between 2007 and 2010 did he mention that he believed he had been discriminated against on the basis of sex.

*     *     *

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on the 1st day of March, 2011.

Lauren M. Long
Chief, Military Equal Opportunity
EEO Counselor / Investigator
National Reconnaissance Office
OEEO&DM